**Edwin RIVERA, Petitioner-Appellee,**

**v.**

**Philip COOMBE, Jr., Superintendent, Respondent-Appellant.**

**No. 1228, Docket 82-2086.**

United States Court of Appeals, Second Circuit.

Argued May 27, 1982.

Decided June 29, 1982.

Daniel Kinburn, Asst. Atty. Gen., New York City (Robert Abrams, Atty. Gen. of the State of N. Y., Gerald J. Ryan, Asst. Atty. Gen., New York City, of counsel), for respondent-appellant.

Judith L. Turnock, Legal Aid Soc., New York City (William E. Hellerstein, New

York City, of counsel), for petitioner-appellee.

Before LUMBARD, MOORE and OAKES, Circuit Judges.

LUMBARD, Circuit Judge:

In 1974, the petitioner, Edwin "Teddybear" Rivera, stabbed a man in the back and killed him. He was subsequently convicted of first-degree manslaughter after a jury trial in the Bronx County Supreme Court. On February 11, 1982, the Southern District of New York, Ward, J., 534 F.Supp. 980, granted Rivera's petition for a writ of habeas corpus, holding that the trial court's instruction on intent violated Rivera's right to due process of law under *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). We disagree and we reverse.

## I.

On the evening of February 28, 1974, Guy Keyes, Jr., came up to seventeen-year-old Rosaria "Coochie" Castro in front of the Carvel store on Boston Road in the Bronx. Rivera, then sixteen, was with Coochie. Keyes, a twenty-two-year-old black man, asked her for a cigarette and "a nickel or a dime." She gave him the cigarette but told him she had no money, and Keyes started arguing with her and Rivera. She then asked Rivera to take her back to her grandmother's store, the Aida Superette, located just down the block. Rivera escorted her there but remained outside.

About ten minutes after Coochie returned to the store, Keyes entered the Superette with two other black men. Like Keyes, they were each about six feet tall. Keyes announced "We are looking for trouble." Coochie and her grandmother began yelling at the three men, telling them to get out, "We don't want no trouble." Coochie's brother, John Velez, heard the yelling and came out of the back room of the store to see what the fuss was about. He saw Keyes and the others leaving, and he followed them out to fight with Keyes, taking his shirt off as he went.

As Velez exited the store, Keyes's two companions were holding Keyes back. A crowd (including Rivera) gathered on the sidewalk. Velez demanded that Keyes fight, but his grandmother and Coochie pushed him back into the store before a fight started.

When Velez next looked out the window of the store, Keyes and the other two black men were gone. He saw Keyes running, turning east on 174th Street from Boston Road. A number of people, including Rivera, were following him.[1] Velez testified that Rivera was about 70–80 feet behind Keyes but that Rivera was "running fast." He lost sight of the chase after everyone turned the corner. Velez never saw Keyes again.

Within about ten minutes, Rivera returned to the Superette. On the way, he saw his friend, Jose Mendez, outside on the street, and told Mendez, "I think I stabbed him in the back." Rivera then entered the Superette, where he displayed a three to four inch knife with a rounded tip and blood on the handle. According to Velez, after showing the knife, Rivera announced, "I think I stabbed him," later adding that it was in the back. Velez also testified that Rivera appeared intoxicated.

At about the same time, Guy Keyes staggered into a liquor store on 174th Street, where he collapsed on the floor. He was taken to a hospital where he died the next day of a single penetrating stab wound four to five inches deep. The knife had entered two and a half inches from the spine on the right side of his back and had traveled down and forward, through the lung, terminating against the spine. The pathologist testified that such a wound could have been caused by an individual running up behind another individual, catching up to him, and plunging a knife like Rivera's in with a downward thrust.

---

1. One witness, Jose Mendez, testified that Rivera was the only person running after Keyes. Velez testified that there was "a couple of people running," but admitted he couldn't be sure it wasn't three or four.

Rivera took the stand in his own defense. He admitted running after Keyes, but denied chasing Keyes with the intent of stabbing him, denied stabbing Keyes, denied ever telling anyone that he had stabbed Keyes, and denied possessing or displaying a knife. He insisted that he followed Keyes only to the corner and had there lost sight of him. Finally, Rivera stated that he had drunk no liquor whatsoever the night that Guy Keyes was stabbed.

Justice Ivan Warner charged the jury on the elements of second-degree murder, first-degree manslaughter, and misdemeanor weapon possession. The relevant instruction here concerns intent, which Justice Warner defined as follows:

I shall now define intent for you. A person is presumed to intend the natural and probable consequences of his act. Criminal intent is an intent to do knowingly and wilfully that which is condemned as wrong by the law. A criminal intent may be inferred from all the circumstances of the case. It need not be established by direct proof. To constitute the crime there must not only be the act but also the criminal intent and these must occur, the latter being equally essential with the former. The existence of criminal intent constitutes a question of fact for determination by you and the burden of showing intent, the intent with which a crime has been committed rests upon the prosecution to establish it by evidence beyond a reasonable doubt. So where the law requires that the People must establish a specific or certain intent on the part of one charged with the commission of a crime, the law does not expect or require for obvious reasons that intent must be proved by directed proof to an absolute certainty or with mathematical precision. Intent, I mean criminal intent, is always an essential element to the commission of the crime such as we have here and it may be proved by direct evidence or it may be proved from circumstances surrounding the transaction or the act itself, or it may be proved by a combination of both. What is intent? Intent is a frame of mind of the perpetrator of the act at the time he commits it. You must probe the mind. You may say to yourself how are we to determine what a man's intentions are. Well members of the jury, we can only determine that by his acts, by his conduct, by what he says and by what he does. You should consider what he allegedly did, what means he allegedly employed, the type of instrument allegedly used, if any, the part of the body allegedly attacked, and all the circumstances. And from these surrounding circumstances you are to determine the intention of the defendant at the time.

Under our law every person is presumed to intend the natural and inevitable consequences of his own voluntary acts and unless such acts were done under circumstances which would preclude the existence of such intent, the jury has a right to infer from the results produced, the intention to effect such result. The intent formed, is a secret and silent operation of the mind and its physical manifestations, the accomplishment of the thing determined upon. The individual whose intent is sought to be ascertained may remain silent or if he speaks, may, probably will if he has a crime to hide, speak untruthfully, and thus the mind is compelled from necessity to refer to the act and the physical manifestations of the intent exhibited by the results produced as the safest if not the only proof of the fact to be ascertained.

Justice Warner followed this with an instruction concerning the difference between the intent required for murder and manslaughter, explaining that second-degree murder requires proof of intent to kill and first-degree manslaughter requires proof of intent to cause serious bodily injury. He also charged the jury at length on reasonable doubt and the presumption of innocence, emphasizing that "[t]he burden of establishing the guilt of the defendant beyond a reasonable doubt rests upon the prosecution and that burden never shifts."

Rivera did not object to the charge on intent.

The jury acquitted Rivera of second-degree murder, N.Y.Pen.L. § 125.25, and convicted him of first-degree manslaughter, N.Y.Pen.L. § 125.20(1), and misdemeanor possession of a weapon, N.Y.Pen.L. § 265.-01(2). On September 12, 1975, the court sentenced Rivera to a prison term of seven to twenty-one years. He is presently free on parole.

Rivera's conviction was affirmed without opinion, 59 A.D.2d 829, 398 N.Y.S.2d 351 (1st Dep't 1977), and leave to appeal to the New York Court of Appeals was denied, 43 N.Y.2d 799, 402 N.Y.S.2d 1037, 373 N.E.2d 299 (1977). On November 28, 1979, Justice Warner denied in a written opinion Rivera's post-conviction motion to vacate the judgment. Stating that "the real issue at the trial was not actually one of intent to kill, but rather, whether or not Edwin Rivera had committed the crime at all," Justice Warner held that the charge on intent did not impermissibly shift the burden of proof to the defendant. Leave to appeal was denied by the Appellate Division. Rivera filed his petition for a writ of habeas corpus on December 31, 1980.

On February 11, 1982, the district court granted the writ and vacated the conviction, finding that the charge on intent shifted the burden of proof to Rivera in violation of *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). First, it found that portions of the charge could have been understood by the jury as requiring rather than merely permitting a finding of intent to commit serious bodily injury once the jury found that Rivera committed an act the natural and probable consequence of which was serious bodily injury (*i.e.*, that Rivera stabbed Keyes in the back). Second, even though the charge contained other language indicating that a finding of intent was permissive and not mandatory, the court could not say that the charge as a whole "clearly informed the jury of the correct rule of law" because the permissive inference instruction was not "necessarily rhetorically inconsistent with a constitutionally invalid interpretation of the judge's earlier conclusive mandatory presumption instruction."

## II.

■ The general principle that we must apply here is not in dispute. Charging a jury that it must presume an element of an offense from some other fact violates a defendant's right to due process of law by relieving the prosecution of its duty to prove all the elements of the offense, *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), or by impermissibly shifting the burden of proof to the defense, *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). Applying this principle, the Court in *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), held that the trial court violated the petitioner's right to due process when it charged the jury that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts."

In *Sandstrom*, the defendant admitted killing the deceased; charged with deliberate homicide, his only defense was that he lacked the specific intent to kill due to "a personality disorder aggravated by alcohol consumption...." 442 U.S. at 512, 99 S.Ct. at 2453. Because no language in the charge indicated that the inference of intent was permissive, the court found it "clear that a reasonable juror could easily have viewed such an instruction as mandatory," 442 U.S. at 515, 99 S.Ct. at 2454, and held that a mandatory presumption was unconstitutional whether the jury understood the instruction as constituting either a conclusive or a rebuttable, burden-shifting presumption. 442 U.S. at 524, 99 S.Ct. at 2459.

■ Here, by contrast, viewing the charge as a whole, the trial judge charged that the jury was to weigh all the circumstances in determining whether Rivera had the requisite intent and that it was entitled to infer intent from his acts. Thus, unlike the abbreviated charge on intent in *Sandstrom*, the charge on intent quoted above, did not either shift the burden of proof to the defendant or remove the issue of intent from the jury's consideration.

The judge began by telling the jury that "[a] person is presumed to intend the natural and probable consequences of his acts." Although the phrase "is presumed" could be construed as mandatory, see *Sandstrom, supra,* the sentence was closely followed by the instruction that "criminal intent may be inferred from all the circumstances of the case." The use of the permissive construction "may be inferred" indicated that the finding of intent was in the jury's discretion. That the defendant had no duty to rebut a mandatory inference of intent was emphasized by the court's next instruction that the "existence of criminal intent constitutes a question of fact for determination by you and the burden of showing intent . . . rests upon the prosecution. . . ." The court then returned to the jury's duty to look at all the facts, stating that intent may be proved by direct evidence, by "circumstances surrounding the transaction or the act itself, or it may be proved by a combination of both." It explained that they could look at the defendant's acts, the instrument that he allegedly employed, and "all the circumstances. And from these surrounding circumstances you are to determine the intention of the defendant at the time." We are hard pressed to see how the jury could have understood these repeated instructions to consider all the evidence in determining intent as requiring it to find intent to kill or to cause serious bodily injury if it found that death or serious injury was the natural and probable consequence of the stabbing.[2]

The next sentence lends even less support to petitioner's claim. The judge told the jury that "[u]nder our law every person is presumed to intend the natural and inevitable consequences of his own voluntary acts and unless such acts were done under circumstances which would preclude the existence of such intent, the jury has a right to infer from the results produced, the inten-

tion to effect such result." This sentence is almost identical to one that we recently held merely instructed the jury as to a permissible method for determining the intent of the defendant. *Mancuso v. Harris,* 677 F.2d 206 (2d Cir. 1982). In *Mancuso* the charge read, in pertinent part: "Everyone is presumed to intend the natural consequences of his act and unless the act is done under circumstances or conditions that might preclude the existence of such intent, you the jury, have to find, have a right to find the requisite intent from the proven actions of an individual." 677 F.2d at 210. Like the *Mancuso* court, we find that the "unless" clause ameliorated any burden-shifting effect of the "natural consequences" clause, and that taken as a whole, this charge "made it quite clear to the jury that it was to consider *all* of the evidence in the case." *Id.* at 211 (emphasis original). *See also Washington v. Harris,* 650 F.2d 447, 453 (2d Cir. 1981).

Finally, the court instructed the jury that the defendant, if guilty, had a motive to lie and that the most accurate means of determining intent was to consider the objective fact of what the defendant did rather than what the defendant testified: "[because the defendant] may . . . speak untruthfully, . . . the mind is compelled from necessity to refer to the act and the physical manifestations of the intent exhibited by the results produced as the safest if not the only proof of the fact to be ascertained." Rivera argues that this amounted to an instruction to ignore his testimony regarding intent and to look only at his acts. However, Rivera did not testify as to his intent in stabbing Keyes. Although he denied *running* after Keyes *with intent to stab* him, Rivera did not testify at all as to his state of mind when he caught up to Keyes and stabbed him in the back,

2. *See also Nelson v. Scully,* 672 F.2d 266 (2d Cir. 1982) where we held that the instruction "a person is presumed to intend the natural and probable consequences of his acts" had been cured by the trial court's repeated emphasis on the prosecution's burden of proof and the jury's obligation to consider all the facts and circum-

stances, 672 F.2d at 272, even though the trial judge followed the "natural and probable" instruction with a highly prejudicial example: "A person cannot, for example, throw someone off the roof of an apartment building and then say he was merely conducting an experiment in aerial dynamics."

nor did he offer any motive or explanation for the stabbing. Rather, he persistently denied stabbing Keyes. In short, the only evidence the jury had to consider regarding Rivera's intent were the physical facts: the circumstances of the argument in front of the Carvel store and later in the Superette; the face-off in front of the Superette; and the fact that Rivera chased after Keyes, caught up to him, and plunged his knife. to the hilt into Keyes's back.[3] Therefore, the instruction to ignore Rivera's testimony regarding his intent was at worst harmless error as he had given no testimony regarding intent. Nor do we believe that this one sentence's emphasis on "the act and ... the results produced" swept from the jurors' minds the previous instructions to consider all the circumstances and evidence. The simple truth is that on these facts a conviction for manslaughter was the best Rivera could expect once the jury found that he had in fact stabbed Keyes in the back.

Supporting our conclusion that the jury understood the charge to mean that it should weigh all the facts in determining Rivera's intent is the fact that it acquitted Rivera of second-degree-murder. Although death is surely a natural and probable consequence of plunging a knife five inches into the middle of someone's back, the jury, by acquitting Rivera on this count, necessarily found that he lacked the intent to kill. The most reasonable explanation for this discrepancy is that the jury found that in light of all the circumstances Rivera did not intend to kill Keyes even though that was the natural and probable consequence of his act.

In conclusion, we find that the charge of intent did not deprive the petitioner of due process of law. Taken as a whole, the charge instructed the jury that it could infer intent from the defendant's acts, but that it should consider all the circumstances in making its finding. Thus, the charge did not shift the burden of proof to the defendant nor remove the issue of intent from the jury's consideration.

The order granting the writ is reversed, with directions to dismiss the petition.

OAKES, Circuit Judge (dissenting):

Recently the Supreme Court in a per curiam opinion chastised another circuit for "having ignored, consciously or unconsciously, the hierarchy of the federal court system created by the Constitution and the Congress," reminding us that "a precedent of [the Supreme] Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be." *Hutto v. Davis*, —— U.S. ——, 102 S.Ct. 703, 70 L.Ed.2d 556 (1982). Today my brethren go even further than *Nelson v. Scully*, 672 F.2d 266 (2d Cir. 1982), *cert. denied*, —— U.S. ——, 102 S.Ct. 2301, 73 L.Ed.2d 1304 (1982), or *Mancuso v. Harris*, 677 F.2d 206 (2d Cir. 1982), to scuttle the Court's unanimous decision in *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). Because, "consciously or unconsciously," the majority ignores the "hierarchy of the federal court system," I dissent.

Judge Lumbard's opinion says, *inter alia*, that "no language in the [*Sandstrom*] charge indicated that the inference of intent was permissive ...." On the contrary, the Supreme Court said in *Sandstrom*, "We do not reject the possibility that some jurors may have interpreted the challenged instruction as permissive, or, if mandatory, as requiring only that the defendant come forward with 'some' evidence in rebuttal." 442 U.S. at 519, 99 S.Ct. at 2456. As here, there were presumption-of-innocence and proof-beyond-a-reasonable-doubt instructions in *Sandstrom, id.* at 518–19 n.7, 99 S.Ct. at 2456–57 n.7, that were arguably permissive and qualifying, but the Court

---

3. Although Rivera now claims that the evidence showed he was intoxicated, intoxication was not raised as a defense at trial. Rivera denied that he had anything to drink the night he killed Keyes; the judge did not charge the jury on intoxication (to which charge Rivera did not object); and Rivera's counsel did not argue intoxication in summation. Of course, the jury was free to consider Velez's testimony that Rivera appeared intoxicated as one of the circumstances bearing on intent.

held that those instructions were "not rhetorically inconsistent with a conclusive or burden-shifting presumption," *id.* What *Sandstrom* condemned was that "a reasonable juror *could* have given the presumption conclusive or persuasion-shifting effect . . . ." *Id.* at 519, 99 S.Ct. at 2456 (emphasis added). The same is true of the instruction here; it must be similarly condemned.

The trial court began its general charge on intent by declaring that "[a] person is presumed to intend the natural and probable consequences of his act." Reasonable jurors could have interpreted this charge, like the charge in *Sandstrom*, as either a conclusive presumption or a burden-shifting presumption on the issue of intent. Interpreting the charge as a conclusive presumption, as Judge Ward said, "once the jury found that serious physical injury to Guy Keyes was a natural and probable consequence of an act performed by Rivera, the jury [would have been] *required* to find that Rivera had the requisite intent to cause Guy Keyes serious physical injury." *Rivera v. Coombe*, 534 F.Supp. 980, 990 (S.D.N.Y.1982) (emphasis in original). Interpreting the charge as a rebuttable presumption, the jurors would have believed that petitioner was obligated to persuade them that he lacked intent. Either interpretation would have deprived petitioner of due process by shifting from the State the burden of proving all elements of the crime beyond a reasonable doubt. *Sandstrom*, 442 U.S. at 519, 524, 99 S.Ct. at 2456, 2459.

Our own circuit has condemned such charges. *See Washington v. Harris*, 650 F.2d 447, 453 (2d Cir. 1981) (charge that "a person intends . . . the necessary and natural consequences of any act he performs" was "constitutionally defective"). So have the First, *United States v. Winter*, 663 F.2d 1120, 1144 (1st Cir. 1981) (instruction not cured by general instructions putting burden on prosecution to prove each element of the crime), the Fifth, *Tyler v. Phelps*, 643 F.2d 1095, 1098–99 (5th Cir. 1981), and the Eighth Circuits, *Dietz v. Solem*, 640 F.2d 126, 131 (8th Cir. 1981), all of whose opinions show more appropriate regard for the Court's holding and reasoning in *Sandstrom* than does the majority here.

*Sandstrom*, in a footnote, leaves the door ajar for instructions that are "rhetorically inconsistent" with the presumption-of-intent instruction, 442 U.S. at 518–19 n.7, 99 S.Ct. at 2456–57. To be sure, in *Nelson v. Scully*, as persuasively interpreted by Judge Ward, 534 F.Supp. at 993–94 n.5, the panel majority found rhetorical inconsistency in the judge's "hammering" at the jury with permissive language. But even *Nelson's* debatable interpretation of *Sandstrom* can not readily be applied here. The remainder of the charge here, instead of making it clear that the presumption language merely described an inference that the jury was permitted to draw from the commission of an act,[1] contained additional language that reasonable jurors could have interpreted as reinforcing the conclusive or burden-shift-

---

1. *See Mancuso v. Harris*, 677 F.2d 206, 211 (2d Cir. 1982); *but see United States v. Robinson*, 545 F.2d 301 (2d Cir. 1976). The charge upheld in *Mancuso* reads:

> Everyone is presumed to intend the natural consequences of his act and unless the act is done under circumstances or conditions that might preclude the existence of such intent, you, the jury, have to find, have a right to find the requisite intent from the proven actions of an individual.

At 210. But in *Robinson*, decided before *Sandstrom*, Judge Meskill said for a unanimous panel:

> Thus, the "natural and probable consequences" charge, particularly when, as here, it contains the phrase "unless the contrary appears from the evidence," is a burden-shifting charge which has the potential for misleading the jury with respect to the re-

quirement that the government must prove every element of an offense beyond a reasonable doubt. *United States v. Barash*, 365 F.2d 395, 402–03 (2d Cir. 1966) (Friendly, J.); *see United States v. Erb*, 543 F.2d 438, 447 (2d Cir. 1976).

545 F.2d at 306.

Arguably, *Mancuso* is in accord with *Washington v. Harris*, 650 F.2d 447, 453 (2d Cir. 1981) ("you may infer . . . unless the act was done under circumstances to preclude the existence of such intent") on this point. It is, of course, the inconsistency I see in this court's decisions as well as the failure of some of them to follow *Sandstrom* that precipitated my dissent from the denial of rehearing *en banc* in *Langone v. Smith*, 682 F.2d 287 (2d Cir. 1982).

ing presumption.[2] Since the judge did not nail down for the jurors the correct rule of law, but rather hammered in both permissive and mandatory concepts, some jurors could have based their verdicts on the impermissible rule. "[T]he fact that a reasonable juror could have given the presumption conclusive or persuasion-shifting effect means that we cannot discount the possibility that [Rivera's] jurors actually did proceed upon one or the other of these latter interpretations." *Sandstrom,* 442 U.S. at 519, 99 S.Ct. at 2457. It is the *possibility, Sandstrom* emphasizes, that is of concern; probability that the jury was misled is not required.

Contrary to the point made in Judge Lumbard's opinion, the jury's acquittal of Rivera on the murder count in no way shows that the erroneous instruction was harmless. The jury could have found that the natural and probable consequence of Rivera's act was to cause serious physical injury, but not to kill. Applying the mandatory presumption, the jury therefore could have found that Rivera had the requisite intent for a first-degree manslaughter conviction, even though neither the presumption nor the other evidence convinced the jury that he acted with the intent to kill.

I would in short affirm Judge Ward, whose carefully crafted opinion is a model of proper deference to the "hierarchy of the federal court system." I regret that the majority opinion here rejects that opinion and goes its own way, upholding an instruction that, as a whole, is more egregious than the one condemned in *Sandstrom* itself.

---

**2.** The first sentence of the second paragraph of the charge in this case is within *Mancuso, see* note 1 *supra,* although, to me, contrary to *Robinson. Mancuso* is not controlling, however, because there the *only* challenged language was the phrase quoted in note 1. Here the lead-in sentence to the intent charge contained *Sandstrom* -condemned mandatory language, and language later in the second paragraph, by stressing the importance of "the act and the physical manifestations of the intent exhibited by the results produced as the safest if not the only proof of the fact to be ascertained," was consistent with and reinforced the mandatory presumption language.